UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**BRIAN SHULTZ**,

        Plaintiff,

   v.

**COMMISSIONER OF SOCIAL SECURITY**,

        Defendant.

Case No. 1:12 CV 2514

Magistrate Judge James R. Knepp II

MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Brian Shultz seeks judicial review of Defendant Commissioner of Social Security's decision to deny Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The district court has jurisdiction under 42 U.S.C. § 405(g) and 1383(c)(3). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 13). For the reasons given below, the Court affirms the Commissioner's decision denying benefits.

## PROCEDURAL BACKGROUND

On June 3, 2009, Plaintiff filed applications for DIB and SSI claiming he was disabled due to a "[l]earning disability, anxiety, and back problems." (Tr. 172-81, 193). He alleged a disability onset date of December 31, 2003. (Tr.172-81). His claims were denied initially (Tr. 109-14) and on reconsideration (Tr. 123-32). Plaintiff then requested a hearing before an administrative law judge (ALJ). (Tr. 113). Plaintiff (represented by counsel) and a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled. (*See* Tr. 19, 41). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the

Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. On July 10, 2012, Plaintiff filed the instant case. (Doc. 1).

**FACTUAL BACKGROUND**

Personal and Vocational History

Born October 2, 1964, Plaintiff was 46 years old on the date of the ALJ hearing held February 1, 2011. (Tr. 41, 172). Plaintiff testified he attended school until the eighth or ninth grade before dropping out. (Tr. 50). His past relevant work included auto detailer, bus boy, porter, and punch press operator. (Tr. 194).

Plaintiff said he had severe back pain which was exacerbated by walking long distances. (Tr. 60-61). When asked what he did to alleviate his pain, Plaintiff said he kneeled down and "it kind of [went] away." (Tr. 62). Plaintiff also said a heating pad "help[ed] out a lot." (Tr. 69). Despite pain, he said he could lift 30-to-40 pounds and sit for an hour at a time. (Tr. 68). He also lived in a house by himself where his landlord let him fix up and maintain the house (paint, patch holes in the wall, clean) in lieu of paying rent. (Tr. 48-49).

Plaintiff engaged in numerous daily activities. He handled his personal care, prepared meals, took care of a dog, cleaned, walked to the corner store to buy groceries, did laundry, performed yard work, conducted house maintenance, painted houses, watched television, played cards, paid bills, applied for jobs, and socialized. (Tr. 48, 55-56, 72-74, 220-23, 271, 304-06). In 2010, Plaintiff took care of his thirteen-year-old niece and ten-year-old nephew for the entire year. (Tr. 55). Plaintiff also bowled and played billiards at least once a month. (Tr. 223). Plaintiff had a driver's license, but it was suspended due to a DUI conviction. (Tr. 49).

Plaintiff testified he could not read or write. (Tr. 50, 223). However, he later clarified he

could write checks, take messages, and complete basic arithmetic. (Tr. 51-52). When asked if he had any difficulty counting money, he replied "[n]o, I'm definitely good at that." (Tr. 52). Plaintiff also said he was able to watch and understand his favorite television show, "Law and Order", from beginning to end. (Tr. 74-75).

Mental Impairments Related to Cognitive Functioning

Plaintiff underwent intelligence testing on two occasions. The first test took place while he was incarcerated at Noble Correctional Institution on November 19, 1996 and revealed he had a Beta I.Q. score of 63. (Tr. 332-46). However, interdisciplinary notes taken a few months after testing indicated Plaintiff "[was] illiterate [but] . . . . obviously not unintelligent." (Tr. 350). Several years later, on May 21, 1999, Dr. Richard Davis administered the Wechsler Adult Intelligence Scale III. (Tr. 409-412). Before testing, Dr. Davis noted Plaintiff's conversation and speech were normal and coherent but indicative of minor poverty. (Tr. 410). Testing revealed a verbal I.Q. score of 69, performance I.Q. score of 67, and a full scale I.Q. score of 65. (Tr. 412). Dr. Davis later invalidated these scores by noting that while Plaintiff "intellectually score[d] within the [m]ild [m]ental [r]etardation range[,] his overall level of functioning appear[ed] to be slightly higher than this and at the lower end of the [b]orderline range." (Tr. 413). Further, when Dr. Davis summarized Plaintiff's test results, he specifically noted "[i]t would appear that on the job [Plaintiff] [was] capable of lower [b]orderline [i]ntellectual [f]unctioning." (Tr. 414). He also questioned whether Plaintiff was being truthful. (Tr. 414).

On June 29, 2006, psychiatrist David Deckert, M.D., completed a mental health evaluation form for Pickaway Correctional Facility. (Tr. 522-23). Dr. Deckert found Plaintiff was alert, fully oriented, and cooperative; had intact memory, judgment, and attention; had normal thought process

and speech; and showed no psychotic signs. (Tr. 522, 780). He diagnosed Plaintiff with dysthymic disorder assigned a Global Assessment of Functioning (GAF) score between 67-70.[1] (Tr. 523).

A few months later, on August 24, 2006, psychiatrist E. Pinta M.D., completed an addendum report to Dr. Deckert's mental health evaluation. (Tr. 514-19). Dr. Pinta noted Plaintiff began taking Wellbutrin in the beginning of August and it had improved his concentration. (Tr. 514). Plaintiff had intact thought process, normal speech, intact cognitive assessment, fair judgment, and he denied suicidal ideation. (Tr. 514-19). Dr. Pinta diagnosed borderline intellectual functioning and assigned a GAF score of 65.[2]

Dr. Pinta completed a mental status evaluation questionnaire on October 26, 2006. (Tr. 464-70). He found Plaintiff was cooperative, had understandable speech, appropriate affect, congruent mood, adequate memory, and sufficient judgment. (Tr. 464-69). Dr. Pinta also noted Plaintiff had good vocabulary despite being illiterate and found he had normal to borderline intellectual functioning. (Tr. 468). He noted Plaintiff's judgment was sufficient to make important personal decisions, find living arrangements, manage funds, and complete daily chores independently. (Tr. 469). Dr. Pinta concluded Plaintiff could follow verbal instructions and was not limited in his ability to maintain attention or perform simple, repetitive tasks, but was mildly limited in his ability to relate to others and withstand stress and pressure associated with day-to-day work activity. (Tr. 470).

---

1. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32–33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood or mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy or theft within the household) but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.* at 34.

2. *See supra* note 1.

On November 8, 2006, state agency psychologist Jennifer Swain, Psy.D., provided Psychological Review Technique (PRT) and Mental Residual Functional Capacity (RFC) assessments. (Tr. 555-64). Dr. Swain generally found no evidence of limitation in the majority of work-related activities and no marked limitations. (Tr. 555-56). She found Plaintiff was not significantly limited in eight out of twenty mental work-related activities but moderately limited in his ability to understand, remember, and carry-out detailed instructions and interact appropriately with the general public. (Tr. 555-56). She also found a moderate restriction in concentration, persistence, and pace. (Tr. 569). Dr. Swain concluded Plaintiff could perform simple, repetitive work with verbal instruction in a non-public setting. (Tr. 557). State agency physician Vicki Casterline, M.D., reviewed and affirmed Dr. Swain's assessment on January 25, 2007. (Tr. 583).

On December 12, 2006, Dr. Pinta completed a discharge summary upon Plaintiff's release from Pickaway Correctional Facility. (Tr. 788-90). He diagnosed Plaintiff with borderline intellectual functioning, noted Plaintiff was not compliant with medication 80 percent of the time, and assigned a GAF score between 60-70.[3] (Tr. 788)

Two years later, on February 8, 2008, Plaintiff was prescribed Prozac for anxiety issues at NorthCoast Correctional Facility (NorthCoast). (Tr. 613). Dr. Sheth diagnosed Plaintiff with mood disorders but declined to check the box indicating mental retardation or developmental disability. (Tr. 622). He found Plaintiff was fully-oriented, had good memory and attention, fair insight, intact judgment, and no suicidal ideation. (Tr. 1272). Follow-up treatment notes indicated a decrease in depression and anxiety symptoms. (Tr. 613-35). He was assigned a GAF score between 50 and 60.[4]

---

3. *See supra* note 1.

4. *See supra* note 1.

(Tr. 622, 1272).

On October 2, 2009, Plaintiff saw psychologist J. Joseph Konieczny, Ph.D., for a psychological evaluation. (Tr. 1639-43). Plaintiff reported he dropped out of school in seventh grade because he could not read or write. (Tr. 1639). He said he had been in "slow learning classes" but did not repeat any grades. (Tr. 1639). Dr. Konieczny noted Plaintiff spoke well "with no looseness of associations or tangentiality evident in his conversation." (Tr. 1641). Plaintiff was pleasant, cooperative, fully oriented, had fair insight, mild deficits in judgment, mild impairments in concentration, adequate motivation and participation, and no suicidal thoughts. (Tr. 1640-41). Dr. Konieczny found Plaintiff had moderate limitations in his ability to understand and follow directions, withstand stress and pressure, and deal with the general public. (Tr. 1642). He noted Plaintiff would need help managing his financial affairs, diagnosed borderline intellectual functioning, and assigned a GAF score of 46-50[5], dependent on intellectual functioning. (Tr. 1642).

State agency physician Carl Tishler, Ph.D., reviewed the evidence and provided PRT and mental RFC assessments. (Tr. 1645-57). Generally, Dr. Tishler found Plaintiff was not significantly limited or found no evidence of limitation in mental work-related activity. (Tr. 1645-46). He found Plaintiff was moderately limited in several activities, including, but not limited to, his abilities to carry out detailed instructions, interact appropriately with the general public, get along with co-workers, respond appropriately to changes in the work setting, and accept criticism from supervisors. (Tr. 1645-46). Dr. Tishler found no marked limitations. (Tr. 165-46). He specifically found Plaintiff "would do best in an environment where social interaction [was] superficial and brief, where duties

---

5. A GAF score between 40-50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *DSM-IV-TR*, at 34.

[we]re verbally explained and/or demonstrated, and where there [we]re no strict production quotas or deadlines." (Tr. 1647). State agency psychologist Caroline Flynn, Psy.D., reviewed and affirmed Dr. Tishler's assessments. (Tr. 1713).

Physical Impairments[6]

On June 15, 2005, treatment notes from NorthCoast showed Plaintiff presented with complaints of back pain. (Tr. 1364). Notes indicated no radiation down his leg, no weakness, no incontinence, and no numbness. (Tr. 1364). He was diagnosed with acute back pain. (Tr. 1365).

On September 4, 2005, Plaintiff saw Dr. M. Shahed at Fairview Hospital with complaints of lower back pain which he said radiated down his left lower extremity. (Tr. 420). Dr. Shahed diagnosed Plaintiff with low back pain. (Tr. 420).

Plaintiff had x-rays taken on September 7, 2006 which revealed spondylolysis at L5 associated with grade II spondylolysis of L5 on S1, with narrowing disc space seen at L5-S1. (Tr. (Tr. 453-54, 533-34, 727-28).

On November 9, 2006, state agency physician Gary Hinzman, M.D., assessed Plaintiff's physical ability to work. (Tr. 574-81). He found Plaintiff could lift 50 pounds occasionally and 25 pounds frequently, stand, walk, and/or sit about six hours in an eight-hour workday, and push and/or pull an unlimited amount. (Tr. 575). Dr. Hinzman found no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 576-78). He concluded Plaintiff had "functional abilities that could be used in a work environment." (Tr. 579). State agency physician John Mormol, M.D., reviewed and affirmed Dr. Hinzman's assessment on January 27, 2007. (Tr. 584).

---

6. Plaintiff argues the ALJ improperly assessed his complaints of back pain. Accordingly, the Court focuses on his impairments relating to back injuries or conditions.

7

Plaintiff complained of back pain during an Ohio Department of Rehabilitation and Correction exam on February 15, 2008. (Tr. 1290-91). However, he had a steady gait and full range of motion and was given no activity restrictions on discharge. (Tr. 1290-91). A few months later, Plaintiff presented to physicians at NorthCoast with complaints of lower back pain. (Tr. 614). Notes indicated negative bilateral straight-leg raise testing and reasonable function. (Tr. 614).

In April 2008, Plaintiff said he fell in the shower and complained of increased back pain with associated numbness in his left lower extremity. (Tr. 1044). However, his thoracic MRI was normal and a lumbar MRI taken May 9, 2008 showed spondylolysis with spondylolisthesis and L5 foraminal stenosis but no spinal stenosis. (Tr. 970, 1255). Later that month, a musculoskeletal exam revealed good range of motion, muscle strength, movement, and posture. (Tr. 996).

On August 13, 2008, Plaintiff went to MetroHealth with complaints of back pain and urinary incontinence. (Tr. 946). Dr. Fulop noted that spondylolysis was likely causing non-debilitating back pain but not bladder problems. (Tr. 946). "[Plaintiff] denied radiculopathic signs or symptoms" and had full strength and grossly intact sensation. (Tr. 946). Dr. Fulop noted Plaintiff might benefit from a pain clinic referral but recommended physical therapy and a mild narcotic agent for back pain. (Tr. 946).

Plaintiff returned to MetroHealth on December 29, 2008 with complaints of back pain which he said radiated intermittently down his right leg. (Tr. 1630-31). On examination, Plaintiff had a normal gait, normal dorsiflexion, and intact sensation. (Tr. 1631). Dr. Bruno diagnosed low back pain. (Tr. 1631).

On February 29, 2009 and June 26, 2009, Plaintiff saw Peter J. Greco, M.D., with complaints of increased back pain. (Tr. 1627, 1706). He said he had pain in his lumbar spine that worsened

8

when bending. (Tr. 1627). There was no edema, deformity, or spasms in the lumbar spine and no radiating pain, but positive straight leg raising bilaterally in the supine position. (Tr. 1628). Dr. Greco prescribed Vicodin. (Tr. 1628).

Treatment notes from Marymount Hospital on April 28, 2009 revealed Plaintiff had "full confrontational strength in the arms and legs with normal tone." (Tr. 1567). His coordination was fast and accurate and his gait was steady and narrow-based. (Tr. 1567).

After allegedly falling down a set of stairs, Plaintiff presented to St. John's West Shore Hospital but ultimately rejected medical treatment. (Tr. 1686-93). A repeat lumbar x-ray revealed severe degenerative narrowing of L5-S1 disc interspace with associated grade II anterior spondylolisthesis of L4 on L5. (Tr. 1677).

On November 19, 2009, state agency physician Diane Manos, M.D., reviewed medical evidence and assessed Plaintiff's RFC. (Tr. 1686-93). Dr. Manos found Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand, walk, and/or sit about six hours in an eight-hour workday, and push/pull an unlimited amount. (Tr. 1687). Plaintiff could occasionally stoop and crawl but never climb ladders, ropes, or scaffolds. (Tr. 1688-90). He had no manipulative, visual, or communicative limitations but was restricted from exposure to machinery and heights. (Tr. 1688, 1690). Dr. Manos noted Plaintiff had normal strength and gait, with no lower extremity weakness or arthritic conditions that would restrict his ability to stand and/or walk. (Tr. 1691). State agency physician Eli Perencevich, D.O., reviewed and affirmed Dr. Manos' opinion on May 24, 2010. (Tr.1714).

ALJ Decision

On February 24, 2011, the ALJ found Plaintiff's severe impairments of degenerative disc

disease, spondylolisthesis, depression, borderline intellectual functioning, and anxiety did not meet or equal a listed impairment. (Tr. 24-25). The ALJ specifically found Plaintiff did not meet listing 12.05 because there was no evidence of intellectual deficits prior to age 22. (Tr. 27). The ALJ noted that despite a full scale I.Q. score of 65, Plaintiff was able to "obtain a drivers license, work as a porter and auto detailer, and [was] currently living independently." (Tr. 27). He also pointed out that Plaintiff babysat his sister's children for a year and was living rent free in exchange for making repairs and cleaning. (Tr. 27).

The ALJ found Plaintiff's statements of disabling pain not credible to the extent they conflicted with the RFC because there were long gaps in treatment, he was noncompliant with medication, and he made inconsistent statements to treatment providers. (Tr. 30).

The ALJ found Plaintiff had the RFC to perform medium work except he could only lift or carry 50 pounds occasionally and 25 pounds frequently. (Tr. 27). He also provided that if there were normal breaks, Plaintiff could sit, stand, or walk up to six hours in an eight-hour workday, occasionally stoop and crouch, but never climb ladders, ropes, or scaffolds. (Tr. 27-28). Plaintiff was further limited from moving machinery, exposure to heights, and driving. (Tr. 28). He could perform simple, routine, repetitive tasks free of fast-paced production requirements which involved simple work-related decisions, routine work-place changes, and verbal instruction or demonstration. (Tr. 28). He was limited to brief, superficial, non-direct contact with the public, and brief, superficial contact with co-workers. (Tr. 28).

Based on VE testimony, the ALJ concluded Plaintiff could perform his past relevant work as a bus boy and automotive detailer and therefore, he was not disabled. (Tr. 32).

**STANDARD OF REVIEW**

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

**STANDARD FOR DISABILITY**

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. §§ 423(a); § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

    2.      Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

    3.      Does the severe impairment meet one of the listed impairments?

    4.      What is claimant's residual functional capacity and can claimant perform past relevant work?

    5.      Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id*. The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ erred by finding he did not meet listing impairment 12.05(C) – mental retardation.[7] Plaintiff also argues the ALJ improperly assessed his complaints of back pain.

### Listing 12.05(C)

A claimant can demonstrate he is disabled by presenting "medical findings equal in severity to all the criteria for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531

---

7. Intellectual Disability replaced the term Mental Retardation in listing 12.05(C) effective September 3, 2013. 78 FR 46499-01 (Aug. 1, 2013).

(1990). The diagnostic description of mental retardation in 12.05 refers to "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part 404, Subpt. P, § 12.05.

To demonstrate mental retardation, now termed intellectual disability, a claimant must establish three factors to satisfy the diagnostic description: 1) subaverage intellectual functioning; 2) onset before age twenty-two; and 3) adaptive-skills limitations. *See Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 675 (6th Cir. 2009); *Daniels v. Comm'r of Soc. Sec.*, 70 F. App'x 868, 872 (6th Cir. 2003). Beyond these three factors, a claimant must also satisfy "any one of the four sets of criteria" in listing 12.05. *See Foster v. Halter,* 279 F.3d 348, 354 (6th Cir. 2001). Pertinent here, 12.05(C) requires a claimant have a valid, verbal, performance, or full scale I.Q. of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. 20 C.F.R. Part 404, Subpt. P, § 12.05(C).

Here, the ALJ determined Plaintiff did not meet the requirements of listing 12.05(C) for two reasons: 1) there was no evidence showing Plaintiff suffered an onset of intellectual deficit before the age of 22; and 2) despite an I.Q. score of 65, Plaintiff was able to obtain a drivers license, work as a porter and auto detailer, live independently, take care of his sister's children, and live rent free for making repairs to his apartment. (Tr. 27).

First, Plaintiff argues the ALJ's reasoning was "unwarranted" because intellectual deficits "[could] easily be traced to [his] childhood". (Doc. 15, at 9). He cites his inability to read or write, dropping out of school in eighth grade, and taking special education classes as support. (Doc. 15, at 9). However, poor academic performance, in and of itself, is not sufficient to warrant a finding

13

of subaverage intellectual functioning before the age of twenty-two. *Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 677 (6th Cir. 2009). Indeed, Plaintiff offers no other evidence to establish onset before age twenty-two. *Id.*; *see also West v. Comm'r of Soc. Sec.*, 240 F. App'x 692, 698 (6th Cir. 2007) (Without establishing onset of subaverage intellectual functioning before age twenty-two, a claimant cannot equal listing 12.05).

Even more, evidence showed he functioned in the borderline intellectual range, not at the mentally retarded level. Dr. Davis found Plaintiff functioned at the borderline intellectual level even though he tested within the mild mental retardation range (Tr. 413); Dr. Deckert found he had normal thought process and assigned a GAF score between 61-70 (Tr. 523); Dr. Pinta diagnosed borderline intellectual functioning and assigned a GAF of 65 (Tr. 519, 788); and Dr. Konieczny diagnosed borderline intellectual functioning (Tr. 1642). Moreover, Plaintiff's psychological evaluations unequivocally showed he had normal thought process, intact judgment, and fair insight. (Tr. 464-69, 514-19, 522, 780, 1272, 1640-41); *Hayes*, 357 F. App'x at 676-77 (finding claimant's allegation of intellectual deficiency was undermined by psychiatric evaluations showing she had clear, logical thinking).

Plaintiff also argues the ALJ erred because he focused on daily activities and social skills when he assessed whether Plaintiff had deficits in adaptive functioning. However, daily activities are not "irrelevant", as Plaintiff suggests; rather, the adaptive skills prong specifically evaluates social skills, communication skills, and daily-living skills. *Hayes*, 357 F. App'x at 677 (*citing Heller v. Doe*, 509 U.S. 312, 329 (1993)). In this regard, Plaintiff was able to live independently, obtain a driver's license, take care of his sister's children, manage his own funds, maintain employment, prepare meals, do laundry and yard work, play cards, apply for jobs, watch and understand

14

television, pay bills, clean, perform basic arithmetic, paint, fix-up houses, count change, and grocery shop. (Tr. 48, 51-52, 55-56, 72-75, 220-23, 271, 304-06). The foregoing belies any argument that Plaintiff had deficits in adaptive functioning.

Finally, Plaintiff argues his full scale I.Q. score of 65 from 1999 qualifies him for listing 12.05(C) and "[t]here are no additional requirements or hurdles [] [he] has to overcome to show he meets this listing." (Doc. 15, at 10). This is simply not true. First, Plaintiff's I.Q. score was not valid. Dr. Davis explicitly noted that while Plaintiff "intellectually score[d] within the [m]ild [m]ental [r]etardation range[,] his overall level of functioning appear[ed] to be slightly higher than this at the lower end of the [b]orderline range." (Tr. 413); *Daniels v. Comm'r of Soc. Sec.*, 70 F. App'x 868, 872 (6th Cir. 2003) (The ALJ acknowledged claimant's WAIS I.Q. score of 67 but determined she was not mentally retarded because [the test administrator] concluded she functioned at a level exceeding her test score). Second, Plaintiff does not meet listing 12.05(C) because he failed to establish the "additional factors" in the diagnostic description – 1) subaverage intellectual functioning; 2) onset before the age of twenty-two; and 3) adaptive-skills limitations. *Blanton v. Soc. Sec. Admin.*, 118 F. App'x 3, 7 (6th Cir. 2004) ("[T]wo IQ scores of 70, without more, does not satisfy the requirements of Listing 12.05(C)."). Accordingly, the ALJ did not err by finding Plaintiff failed to meet or equal listing 12.05(C).

**<u>Credibility Regarding Pain</u>**

Plaintiff argues the ALJ improperly assessed his credibility and complaints of back pain and did not address the factors to be applied to decide whether Plaintiff suffered from disabling pain. (Doc. 15, at 11–14). The "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability." *Jones*, 336

F.3d at 476. An ALJ's credibility determinations about the claimant are to be accorded "great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.' However, they must also be supported by substantial evidence." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (quoting *Walters*, 127 F.3d at 531); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) ("[W]e accord great deference to [the ALJ's] credibility determination.").

First, an ALJ determines whether there is objective medical evidence of an underlying medical condition; then, the ALJ examines whether objective evidence confirms the alleged severity of pain or the condition could reasonably be expected to produce the allegedly disabling pain. *Felisky v. Bowen*, 35, F.3d 1027, 1038–39 (6th Cir. 1994). Social Security Ruling 96-7p clarifies how an ALJ must assess the credibility of an individual's statements about pain or other symptoms:

> In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 C.F.R. § 404.1529(c) and § 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:
>
> 1. The individual's daily activities;
>
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
>
> 3. Factors that precipitate and aggravate the symptoms;
>
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
>
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
>
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20

> minutes every hour, or sleeping on a board); and
>
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3. An ALJ is not required, however, to discuss each factor in every case. *See Bowman v. Chater*, 1997 WL 764419, at *4 (6th Cir. 1997); *Caley v. Astrue*, 2012 WL 1970250, *13 (N.D. Ohio 2012).

Here, the ALJ found Plaintiff's statements about his symptoms not credible because of long treatment gaps, medication non-compliance, and inconsistent statements. (Tr. 30). Therefore, the ALJ considered several of the required factors in addressing Plaintiff's credibility – namely, Plaintiff's treatment, medication compliance, and inconsistent statements to physicians regarding pain intensity.

In the alternative, Plaintiff claims the ALJ's credibility analysis was incomplete because it was only sufficient to find Plaintiff not credible with regard to his psychiatric impairments, not his disabling pain. (Doc. 15, at 12). Not so. While Plaintiff's medication non-compliance was tied to his mental health treatment[8], the remainder of the ALJ's credibility analysis specifically addressed his allegations of disabling back pain. (Tr. 30).

First, Plaintiff argues there was not "a single instance in which [he] gave inconsistent statements to treatment providers" regarding his back pain. (Doc. 15, at 13). To the contrary, the ALJ noted Plaintiff made complaints of intermittent radiating pain to treatment providers while in prison (Tr. 1044) but denied similar symptoms to Drs. Fulop and Greco (Tr. 946, 1628).

The ALJ also pointed to a large treatment gap between 2006 and 2008, which Plaintiff tried to

---

8. The ALJ specifically pointed to treatment notes indicating Plaintiff was not compliant with his mental health regimen 80 percent of the time. (Tr. 30).

17

undermine because he said he lacked health insurance. (Tr. 30; Doc. 15, at 12). Nevertheless, an ALJ is required to consider the type of treatment received when evaluating whether a symptom is disabling. 20 C.F.R. §§ 404.1529(c)(v), 416.929(c)(v). Not only was there a two year treatment gap, Plaintiff's pain was unequivocally treated conservatively. For instance, Dr. Fulop recommended physical therapy and a mild narcotic agent (Tr. 946); Dr. Shahed prescribed Motrin (Tr. 420); NorthCoast doctors discharged him with no activity restrictions (Tr. 1291); Dr. Bruno referred Plaintiff to a pain management clinic for non-narcotic modalities (Tr. 1631); Dr. Greco prescribed Vicodin (Tr. 1628); and Plaintiff testified a heating pad alleviated pain (Tr. 69). Plaintiff also rejected medical treatment from St. John's West Shore Hospital after allegedly falling down stairs. (Tr. 1674).

Plaintiff points to two diagnostic tests indicating spondylolisthesis at L4-L5 and narrowing of the L5-S1 intervertebral disk. (Tr. 696, 1677). Importantly, doctors reviewing these tests treated Plaintiff using conservative methods. (Tr. 946, 1627). Further, as the ALJ pointed out, treatment notes throughout Plaintiff's alleged disability period indicated he had a steady gait, full range of motion, reasonable function, full muscle strength, and negative straight leg raise testing. (Tr. 29, 614, 946, 996, 1290, 1364, 1567, 1628, 163). On one occasion, Plaintiff did have positive straight leg raise testing in the supine position but there was no evidence of deformity or spasms in the lumbar spine. (Tr. 1628).

Moreover, substantial evidence showed Plaintiff's complaints of disabling pain were inconsistent with his reported daily activities. Plaintiff was able to perform yard work, conduct house maintenance, paint, clean, do laundry, care for his sister's children, walk to the store to shop for groceries, and play billiards.

The ALJ sufficiently discussed several of the factors necessary in determining credibility and his substantial evidence supports his decision.

## CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds substantial evidence supports the ALJ's decision. Therefore, the Court affirms the Commissioner's decision denying benefits.

IT IS SO ORDERED.

s/James R. Knepp, II<br>United States Magistrate Judge